# United States District Court

### WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

vs.

**CRIMINAL COMPLAINT**

**ROBERT LOGEL**

08 - M - 112

**I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief.**

Beginning in or about October 2003, and continuing through in or about April 2007, in the Western District of New York and elsewhere, the above named defendant did knowingly, having devised a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, and for the purpose of executing the scheme, did knowingly cause writings, signs, and signals, including but not limited to directions to transfer funds by wire, to be transmitted in interstate commerce; in violation of Title 18, United States Code, Section 1343.

**I further state that I am a** <u>Special Agent of the Federal Bureau of Investigation,</u> **and that** this complaint is based on the facts set forth in the attached affidavit.

JAMES F. LAFFERTY, II
Federal Bureau of Investigation

**Continued on attached and made a part hereof.**

**Sworn to before me and subscribed in my presence,**

<u>August 8, 2008</u>   at   <u>Buffalo, New York</u>
Date                          City and State

H. KENNETH SCHROEDER, JR.
UNITED STATES MAGISTRATE JUDGE

Signature of Judicial Officer

**AFFIDAVIT**

James F. Lafferty, II, being duly sworn, states:

1.  I am a Special Agent of the Federal Bureau of Investigation, and have been a Special Agent for approximately six years. I am currently assigned to the White Collar Crime Squad and have been assigned to that squad for the same period of time. Prior to my employment with the FBI, I was employed as a Certified Public Accountant with a public accounting firm for approximately four years.

2.  I submit this affidavit in support of a complaint charging ROBERT LOGEL with a violation of Title 18, United States Code, Section 1343 (fraud by wire). The facts set forth in this affidavit are based upon my review of documents pertinent to the investigation, and facts provided to me by other agents and analysts. Because this affidavit is made for the limited purpose of supporting a criminal complaint, the affidavit does not set forth each and every fact learned during the investigation to date.

3. As a result of the investigation, I have learned the facts stated below in this affidavit regarding investments made by persons whom I will refer to herein as KK, CB, and DP. All of these persons are adult men who reside in the United States. I

have spoken to each of these men by telephone, as well as in person, and, as a result of that and of reviewing financial and other documents relating to their investments with ROBERT LOGEL, I have learned the facts set forth below.

### Investments by KK

4. KK resides in Texas and has known Logel for several years. KK continues to speak with Logel from time to time, through, approximately, the present time. Recent contacts between KK and Logel have related to the efforts Logel claims to be making in order to pay back KK the money Logel owes him. KK gave money to Logel for what Logel told KK were investments in companies known as Freedom 4Wireless, Smartpill, American Capital Holdings (ACH), and Native Discount Pharmaceutical Direct, LLC ("Native Rx").

#### A. Freedom 4Wireless, Smartpill, and ACH

5. In 2003 and 2004, Logel received about $2,240,530 from KK, based upon Logel's representations that Logel would use the money received from KK in order to transfer to KK shares in certain companies, which included Freedom 4 Wireless, Smartpill, and ACH, which shares Logel told KK were owned by Logel or entities Logel controlled.

6. Although KK during this time period believed he was acquiring shares in these companies when he made wire transfers to

3

Logel from his (KK's) bank accounts in Texas to accounts controlled by Logel in the Western District of New York, KK later learned from Logel that Logel in fact did not own shares in these companies, nor had Logel used KK's money to acquire shares in them.

7. Instead, KK advised that when KK from time to time asked Logel for proof of his (KK's) ownership in the companies, Logel would assure KK that proof of ownership was forthcoming. Logel however, never could or did produce proof of ownership, despite repeated requests by KK.

8. In July 2004, in an attempt to assure KK that KK had become the owner of shares in the companies, Logel executed a Stock Purchase Agreement dated 29 July 2004, by which Logel (through a family company he controlled called RKZN), purported to "sell" KK shares in Smartpill, Freedom 4 Wireless, and ACH. As KK later learned, Logel in fact did not own any such shares, nor had he acquired any for KK. As a result of receiving this document, however, KK continued to send funds to Logel by means of wire transfers so that by the close of 2004, KK had given Logel more than $2.2 million for shares in companies that in fact Logel could not have sold to him. When KK continued to ask Logel for stock certificates, Logel continued to fail to provide them.

9. Late in 2006, Logel acknowledged to KK that KK did not in fact ever own any shares in Freedom 4Wireless or ACH. This came about two years after Logel signed the above mentioned "Stock Purchase Agreement" in which Logel claimed to own (through RKZN), 540,000 shares of Smartpill, 443,000 shares of Freedom 4Wireless, and 340,000 shares of ACH. In order to give assurances to KK that he (Logel) was obligated to him for the moneys KK thought he had invested in ACH and Freedom 4Wireless, Logel gave KK "Promissory Notes" that purported to obligate Logel to pay KK $1,757,400 for KK's Freedom 4Wireless investment, and $1,720,000 for KK's ACH investment. Logel signed both notes and gave them to KK late in 2006. The maturity dates on both notes was January 1, 2007.

10. Regarding the money KK thought he had invested in Smartpill, Logel told KK in or about December 2006 that he was about to pick up the stock certificates in that company from a Smartpill executive, and that the certificates would be in the name of RAKIN, which was controlled by KK. However, when KK called the aforementioned Smartpill executive, he was advised that neither RAKIN nor KK, nor Logel owned any Smartpill shares. After this conversation, KK spoke to Logel, who then told KK that the Smartpill shares were held in the name of Logel's family company, RKZN. However, in or about April 2007, Logel acknowledged to KK that RKZN did NOT own any Smartpill shares.

11.  Logel gave KK a document signed by Logel dated April 25, 2007, which I have reviewed, which states that "RKZN has returned the cost basis of the shares [KK] purchased to him for a total of $1,010,000 as of July 1, 2007." This confirmed Logel's acknowledgment that Logel did not use KK's money to acquire shares in Smartpill. KK received no money back from Logel regarding the investment KK thought he had made in Smartpill.

12.  I have confirmed, by way of contacts with responsible personnel from Freedom 4Wireless, that neither Logel, KK, RAKIN, nor RKZN ever owned shares in that company.

13.  In May 2008, KK advised the government that when he told Logel that he (KK) was coming to Buffalo for reasons relating to this investigation, Logel said words to the effect that he (Logel) might as well be in front of a firing squad and be shot because I'm (Mr. Logel) dead.

14.  KK also advised that, in a different conversation between himself and Logel earlier this Spring, in or about April, Logel and KK were discussing the money KK believed he had invested in Freedom 4Wireless. During that conversation, Logel mentioned that a person both men knew from Freedom 4Wireless was coming to Buffalo in connection with this investigation, and that Logel claimed he did

6

not know why this person would be coming here. In this context, Logel told KK that there were a lot of people that he (Logel) had, to paraphrase, taken advantage of, and that Logel added that he was going to have to pay for it. KK said he understood "pay for it" to be a reference to criminal prosecution rather than money.

### B. Native Discount Pharmaceutical Direct, LLC ("Native Rx")

15. In 2004, at Logel's recommendation, KK invested $700,00 in a Delaware corporation called Native Discount Pharmaceutical Direct, LLC, which came to be known as "Native Rx." Native Rx operates a pharmacy in Salamanca, New York. Later, KK incorporated, in Nevada, a different company, which was called Native Rx LLC. KK had no involvement in the incorporation of the Delaware corporation. KK incorporated the Nevada company (Native Rx LLC) in anticipation of the Delaware corporation's successfully attaining its business goals, which included doing substantial business in different parts of the United States. This did not occur, and therefore, according to KK, the Nevada company incorporated by KK (Native Rx LLC) never became operational.

16. KK's money ($700,000) *was* in fact invested in the above mentioned Delaware Corporation known in shorthand as Native Rx, although this company did not perform as Logel projected that it would. However, I learned during the investigation that Logel used

7

the similarity in the names of the two Native Rx companies to defraud a resident of the Western District of New York referred to below in this affidavit as CB. See paragraphs 17 - 26.

### Investments By CB

17. CB resides in the Western District of New York and has an agricultural business in Chautauqua County. CB's acquaintance with Logel was partly social and partly business (i.e., investments). From August through December 2006, Logel's false representations to CB influenced CB to part with $448,829, all but $50,000 of which went to Logel. Logel received this money from CB based upon false representations to CB that **a)** $75,000 would be used for a short-term loan maturing in November 2006 from CB to a pharmaceutical company called Native RX; **b)** $335,000 would be used to acquire pharmaceutical products at low cost, for distribution at a high profit; and **c)** an additional $38,829 would go towards completing the balance of a $600,000 "loan" from CB to Silver Oak, LLC, pursuant to a promissory note, which was mis-dated October "2002" but which had a true date of October 2006.

18. CB stated that, prior to parting with the aforementioned $75,000 that he believed he was lending to Native Rx, Logel told him, among other things, that Native Rx had a store in Salamanca, New York, and that it had several stores in the Western U.S. Logel

also told CB that he (Logel) had loaned money to Native Rx in the past, and that this is how he (Logel) got his "Clank," which CB understood to be pocket money. The document Logel presented to CB as written evidence of this "loan," however, identified the borrower as "Native Rx, LLC." As noted above, Native Rx LLC was established by KK, and was not the same company as the one that had a store in Salamanca, New York.

19. When I showed the "Loan" note to KK, KK confirmed that he himself established Native Rx LLC and that Logel had nothing to do with it and had never been an employee or an officer or agent who ever had authority to act on behalf of Native Rx LLC. KK said, however, that Logel did know of the company's existence. KK advised that in August 2006, Logel said he (Logel) could repay $50,000 to KK. Logel told KK that the source of the $50,000 was money he (Logel) was borrowing from CB. KK advised that Logel proposed to structure the transaction by a wire transfer of $75,000 to the Native Rx LLC account, and that KK (who controlled that account), should take $25,000 from those funds and send the $25,000 back to Logel. Although KK thought this arrangement was peculiar, he agreed to it, and the funds were transferred and exchanged as proposed by Logel.

9

20. I also showed the "Loan" document to a representative from Native Discount Pharmaceutical Direct (the Delaware corporation located in Salamanca, NY). He confirmed that this company also never borrowed money from Robert Logel or from CB.

21. On or about August 2, 2006, CB, as instructed by Logel, wire transferred $75,000 from his account at his bank in Arcade, New York, to a receiving bank in Charlotte, North Carolina, for the benefit of Native Rx LLC. As stated above, KK received this transfer, and returned $25,000 of it to Logel.

22. As noted above, KK confirmed to me that, by August 2006, KK had been questioning Logel's conduct, and that Logel had finally acknowledged that he had not sold KK the shares that KK thought he had been purchasing. Thus when Logel used the $75,000 he received from CB to make partial ($50,000) repayment to KK, it was in the context of a much larger fraud, since KK had by then given Logel more than $2 million. Logel therefore used CB's initial $75,000, not to undertake a high interest loan for CB, but to make a partial repayment of money he had fraudulently obtained from KK.

23. Regarding the remainder of the money Logel obtained from CB, Logel stated to CB in October 2006 that the combination of CB's

$75,000 Native RX "loan" investment, plus the above mentioned $335,000 investment, had generated earnings to CB such that an additional $38,829 from CB would, if added to the principal and the earnings of CB's other "investments," bring the total of CB's investments and earnings to $600,000.

24. Logel also told CB that if CB lent this "$600,000" and took a promissory note from a company called Silver Oak, LLC, the note would be repaid at an interest rate of four percent. CB agreed to this, and a note dated October 2006, with a maturity date of December 22, 2006, was signed by Logel and given to CB in exchange for $38,829, which CB gave to Logel.

25. In fact, Logel had not invested any money CB had given him. No earnings had been made on CB's money, and the $600,000 promissory note was fraudulent. In or about October 2006, Logel gave CB a check, post-dated December 15, 2006, in the amount of $600,000. This check purportedly was drawn on an account of Silver Oak, LLC, at the Bank of America.

26. CB advised that Logel gave this check to CB in order to give CB assurances that CB would receive from Logel all the funds CB had given to Logel, including principal ($448,829) and "earnings" ($151,171). However, when CB tried to negotiate this

11

check in February 2007, the check was returned to him (CB) because the Silver Oaks account had been closed. CB never received any of his money back from Logel.

### Investments By DP

27. DP, who resided and worked in California, invested money as set forth below based upon representations made to him by Logel. First, on or about October 24, 2003, DP invested $250,000 in Logel's venture capital company called Spaulding Ventures. This followed several phone conversations between DP and Logel via long distance calls between California and Logel's area code, which DP remembered as being 716. Logel mentioned several companies to DP, including companies identified by Logel as Native Rx and Smartpill.

28. Logel told DP that there was little or no risk involved in the Spaulding Ventures investment because, according to Logel, all of the companies owned by Spaulding Ventures were prime candidates for going public. In fact, Spaulding Ventures had accumulated such a degree of debt by the time DP had invested that Logel was forced to transfer all equity and debt in Spaulding Ventures to a separate company, i.e., American Capital Holdings. Logel did not inform DP of Spaulding Ventures's debt problems, or of the upcoming transfer of his equity position to ACH.

29. DP ~~JFL~~ sent Logel a check for $250,000 to make this investment. Also, DP made a $95,000 interstate wire transfer from California to Logel in order to invest in Smartpill. Moreover, following receipt of an e-mail from Logel dated November 6, 2003, DP on the same day made an interstate wire transfer to Logel's bank account in Williamsville, New York by which $625,000 was transferred from DP's bank account in California to Logel's account in Williamsville, New York. Based on Logel's representations to DP, $375,000 of this amount was to be an investment in Native Rx (Salamanca, NY), and $250,00 to be as a further investment in Smartpill.

30. In fact, Logel never put any of DP's money towards shares in Native Rx or Smartpill. For example, despite repeated requests by DP to Logel for written evidence of ownership in Native Rx, Logel repeatedly failed to produce any documentation. Subsequently, DP recouped, from a source other than Logel, the money that he had intended to invest in Smartpill and Native RX, although DP has not recouped the $250,000 invested in Spaulding Ventures.

31. WHEREFORE, based upon the facts sets forth above, the undersigned submits that there is probable cause to believe that Robert Logel conceived and executed a scheme to defraud and obtain money from DP, CB, and KK by means of materially false statements

and representations, which included false representations that the money Logel received from them would be used to invest in or loan money to such companies as Smartpill, ACH, and Native Rx, when in fact the money received from them was not so used, and, in furtherance of the scheme, LOGEL did knowingly cause writings, signs, and signals, including directions to transfer funds by wire, to be transmitted in interstate commerce, in violation of Title 18, United States Code, Section 1343.

_____
JAMES F. LAFFERTY, II
Federal Bureau of Investigation


Sworn to before me this
8th day of August, 2008

_____
H. KENNETH SCHROEDER, JR.
United States Magistrate Judge